United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOSE MANUEL CARRANZA,

Plaintiff,

v.

G. LEWIS, et al.,

Defendants.

Case No. 15-cv-00682-YGR (PR)

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

On February 3, 2015,[1] Jose Manuel Carranza, a state prisoner, filed the instant *pro se* action pursuant to 42 U.S.C. § 1983. Plaintiff challenges his validation as a gang member and placement in the Secure Housing Unit ("SHU") at Pelican Bay State Prison ("PBSP"), where he was previously incarcerated. Dkt. 1. Plaintiff seeks injunctive relief and monetary damages. *Id.* at 62-64.[2] At the time he filed the instant complaint, Plaintiff had informed the Court that he "originally filed this complaint on March 21, 2014." *Id.* at 9. The following background relating to Plaintiff's prior action is taken from the Court's July 20, 2015 Order of Partial Dismissal; and Serving Cognizable Claims:

> The Court notes that Plaintiff is referring to the second amended complaint that he filed in his prior action, Case No. C 13-3337 YGR (PR). Dkt. 24 in Case No. C 13-3337 YGR (PR). After the Court had ordered service of the claims in his prior action (but before Defendants filed their answer), Plaintiff moved for voluntary dismissal so that he could exhaust his administrative remedies. Dkt. 30 in Case No. C 13-3337 YGR (PR). Plaintiff claimed that while he had exhausted his prison administrative remedies, he had failed to file a claim for damages with the California Victim Compensation and Government Claims Board ("CVCGCB"). *Id.* at 2-3.

[1] The Clerk of the Court received the instant complaint on February 13, 2015. Dkt. 1 at 1. Plaintiff signed his complaint on February 3, 2015. *Id.* at 3. Plaintiff declared under penalty of perjury that he submitted the complaint to jail authorities for mailing on that date. *Id.* at 66. Therefore, the Court applies the "mailbox rule" to deem the complaint constructively filed on February 3, 2015, the date it was signed. *See Douglas v. Noelle*, 567 F.3d 1103, 1109 (9th Cir. 2009) (recognizing that the mailbox rule applies to the filing of a federal civil rights complaint).

[2] Page number citations refer to those assigned by the Court's electronic case management filing system and not those assigned the parties.

> On July 25, 2014, pursuant to Plaintiff's notice of voluntary dismissal, the Court terminated his prior action. Dkt. 31 in Case No. C 13-3337 YGR (PR) at 1. The Court noted that the dismissal was without prejudice. *Id.*
>
> On September 23, 2014, Plaintiff filed a claim with the CVCGCB, which did not act on his claim within forty-five days; therefore, he claims this constitutes a denial. Dkt. 1 at 9-10 (citing Cal. Gov't Code § 912.4(c)).

Dkt. 8 at 1-2. Thereafter, Plaintiff filed his complaint in the instant action, raising the same allegations that he brought in his prior action, and he has named all of the same Defendants, except Sergeant A. B. Gomez. *Compare* Dkt. 1 at 5-10 to Dkt. 24 in Case No. C 13-3337 YGR (PR) at 12. Thus, in the instant action, the named Defendants from PBSP are as follows: Warden G. D. Lewis; Chief Deputy Warden P. T. Smith; Facility Captain K. Cruse; Sergeant R. Randow; and Licensed Clinical Social Worker V. Cappello. Dkt. 1 at 5. Meanwhile, the named Defendants from the California Department of Corrections and Rehabilitation ("CDCR") in Sacramento are the following: Director Matthew Cate; Appeals Examiner K. J. Allen; Inmate Appeals Branch Chiefs R. Manuel and D. Foston; Special Services Unit Special Agents B. Kinroton, D. S. McClure, Buechner, S. S. Kissel and C. M. Rojers. *Id.*

**A. Plaintiff's Claims**

The following background relating to Plaintiff's claims is also taken from the Court's July 20, 2015 Order of Partial Dismissal; and Serving Cognizable Claims:

> Plaintiff challenges his July 8, 2009 placement and resulting retention in administrative segregation in the SHU on the basis of his alleged association with the Mexican Mafia ("EME") prison gang.[3] Plaintiff denies that he is a gang associate, and alleges multiple violations of the federal and state constitutions stemming from his placement and retention in the SHU. Furthermore, Plaintiff alleges that he is serving a prison term of twenty-seven years to life with the possibility of parole. Dkt. 1 at 32. Although he is now in general population, Plaintiff claims that prison officials "continue to classify [him] as a validated Mexican mafia associate." Dkt. 2 at 1-2. Plaintiff explains that he is now on a "twelve-month observational period in [] general population," where due to his status as a gang associate, he is subjected to aggressive searches,

[3] Plaintiff claims that he was first placed in the SHU at the California State Prison in Corcoran [("CSP-Corcoran")] on July 8, 2009. Dkt. 1 at 10-12. Plaintiff remained in the SHU at [CSP-Corcoran] until his transfer to PBSP on January 14, 2010. *Id.* at 17. Plaintiff claims he was retained in the SHU at PBSP for five years. *Id.* at 39.

urinalysis testing, and excessive monitoring of visitors, phone calls, and mail. *Id.* at 1. Also, Plaintiff emphasizes that he can be sent back to the SHU indefinitely if he is written up for a rules violation and that his gang validation renders him ineligible for parole. *Id.* at 2. Thus, Plaintiff argues that he "continues to suffer continuous harm and discipline and punishment as a result of CDCR[']s erroneous validation." *Id.* Plaintiff also objects that his "validation as an associate is based on his ethnic group as a southern Hispanic rather than actual gang activity." *Id.*

According to CDCR policy and practice, Plaintiff can only remove his gang associate status if he debriefs or provides information incriminating other prisoners. Plaintiff argues that under this policy he can never remove his status because he is unable to debrief because he is not a gang associate, and he has no inculpatory evidence to provide prison officials. Specifically, Plaintiff alleges the following claims:

(1) a violation of his Fourteenth Amendment due process rights based upon Defendants' placement of Plaintiff in long-term administrative segregation in the SHU without a fair hearing and Defendants' failure to act and investigate Plaintiff's claim that he is not a prison gang associate;

(2) a violation of his Eighth Amendment right to be free of cruel and unusual punishment based on Plaintiff's erroneous classification as a gang associate and placement in the SHU at PBSP;

(3) a violation of his Eighth Amendment right to be free of cruel and unusual punishment based on Defendants' failure to act and investigate Plaintiff's claim that he is not a prison gang associate;

(4) a violation of his Fifth Amendment due process right against self-incrimination based on Defendants' requirement that Plaintiff becomes an informant about gang activities in order to be released from the SHU;

(5) a violation of the terms of the settlement agreement in *Castillo v. Alameida*, No. 94-2847 MJJ (PR) (N.D. Cal.), based on Defendants' placement of Plaintiff in long-term administrative segregation in the SHU on the basis of evidence that is unreliable and insufficient;

(6) a violation of his state-created liberty interest in release from the SHU;

(7) a violation of his Fourteenth Amendment due process right by Defendants promulgating, enforcing and implementing prison rules and regulations that are vague and overbroad;

(8) a violation of his First Amendment right of association on the ground that Plaintiff's indefinite confinement in the SHU prevents him from associating with other prisoners;

(9&10) violations of various provisions of California constitutional and statutory law;

> (11) a violation of his rights due to certain Defendants' failures, in their supervisory capacity, to establish lawful policies and procedures and to train their subordinate employees properly;
>
> (12) a violation of his Eighth Amendment right to be free from cruel and unusual punishment on the ground that Defendants' requirement that Plaintiff debrief and become an informant exposes him to a substantial risk of death or serious bodily injury;
>
> (13) a violation of his Fourteenth Amendment right to equal protection based upon Defendants' intentional discrimination against him on the basis of his racial group;
>
> (14) a violation of his Fourteenth Amendment due process rights and state created liberty interest in denying him a meaningful review of his gang status and SHU confinement for possible release from such confinement;
>
> (15) a violation of his Fourteenth Amendment due process rights by misinterpreting and arbitrarily applying regulations concerning gang activity and validations for association upon the Plaintiff; and
>
> (16) a violation of his Fourteenth Amendment equal protection rights where Plaintiff has suffered and continues to suffer from Defendants utilizing a statewide systemic policy of using race as a proxy to validate inmates as gang associates and housing them in long-term administrative segregation in the SHU and denying them release from this confinement based on their "gang status."

Dkt. 8 at 2-4 (citing Dkt. 1 at 50-61) (footnote in original).

### B. Court's Initial Review of Plaintiff's Claims

The Court reviewed the complaint and found as follows, as taken from its July 20, 2015 Order (cognizable claims (1), (3), (4), (6), and (8) through (16) emphasized in **bold**):

> 1. Plaintiff's claims for injunctive relief based on his confinement at PBSP [were] DISMISSED as moot.
>
> **2. Plaintiff's allegations regarding placement and retention in administrative segregation in the SHU at PBSP when liberally construed, state[d] cognizable claims under section 1983 for a denial of due process and for supervisory liability—claims (1), (3), (11), (14), and (15)—against the aforementioned PBSP and CDCR Defendants (hereinafter "Defendants").**
>
> **3. Plaintiff's allegations present[ed] a constitutionally cognizable due process claim—claim (6)—based on a denial of his state-created liberty interest in parole.**
>
> 4. Plaintiff's Eighth Amendment claims related to his alleged erroneous classification as a gang associate and placement in the SHU at PBSP and Defendants' failure to investigate his claim that he is not a prison gang associate—claims (2) and (3)—[were]

DISMISSED WITHOUT PREJUDICE.

**5. Plaintiff state[d] a cognizable Eighth Amendment claim—claim (12)—that the debriefing policy subjects him to cruel and unusual punishment in violation of the Eighth Amendment because it requires him to put himself, his families and friends at risk of physical attack in order to be released from the SHU.**

6. Plaintiff's claim (5), which state[d] that Defendants violated some provision in the settlement agreement in *Castillo v. Alameida*, N.D. Cal. No. 94-2847 MJJ (PR), [was] DISMISSED WITHOUT PREJUDICE.

**7. Plaintiff state[d] a cognizable claim that the debriefing requirement violate[d] his Fifth Amendment right against self-incrimination—claim (4).**

8. Plaintiff's claim (7), in which he contend[ed] that Defendants enforced vague and overbroad regulations (related to gang validation) [was] DISMISSED WITHOUT PREJUDICE.

**9. Plaintiff state[d] a cognizable claim of a violation of his First Amendment right to association based on his allegation that he was placed and retained in the SHU based solely on his association with members of the EME Prison Gang—claim (8).**

**10. The Court will exercise supplemental jurisdiction over Plaintiff's state law claims—claims (9) and (10).**

**11. Plaintiff's allegations present[ed] constitutionally cognizable equal protection claims—claims (13) and (16).**

Dkt. 8 at 12-13 (brackets and emphasis added).

**C. Defendants' Motion for Summary Judgment**

Before the Court is Defendants' motion for summary judgment. Dkt. 37. Defendants argue that (1) Plaintiff failed to exhaust administrative remedies under the Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e(a), as to the claims concerning parole, the CDCR's gang debriefing[4] program, and alleged racial discrimination; (2) Plaintiff lacks standing

---

[4] Debriefing is the process by which a gang coordinator/investigator determines whether an offender ("subject") has dropped out of a gang. *See* Cal. Code Regs. tit. 15, § 3378.5(a). A subject shall be debriefed only upon his or her request, although staff may ask a subject if he or she wants to debrief. *Id.* The purpose of the debriefing interview is to provide staff with information about the gang's structure, activities, and affiliates. *Id.* § 3378.5(b). A debriefing is not for the purpose of acquiring incriminating evidence against the subject. *Id.* The object of a debriefing is to learn enough about the subject and the subject's current gang to: (1) allow staff to conclude on a reasonable basis that the subject has dropped out of the gang, and (2) allow staff to reclassify the subject based upon the offender's needs in conjunction with the security of the institution, as well as, the safety and security of staff and other offenders. *Id.*

to assert claims concerning his access to parole and the debriefing program; and (3) the statute of limitations has expired as to the remaining claims arising out of Plaintiff's 2009 gang validation. *Id.* at 1-2. Accordingly, Defendants argue they are entitled to summary judgment. *Id.* Plaintiff filed an opposition, and Defendants filed a reply. Dkts. 50, 52. For the reasons outlined below, the Court GRANTS Defendants' motion for summary judgment.

## II. DISCUSSION

### A. Procedural Background Regarding Gang Classification[5]

On July 8, 2009, while housed at CSP-Corcoran, a correctional officer informed Plaintiff that he was going to be validated as a prison gang associate. Dkt. 1 at 10. Plaintiff was informed that his validation was based on three pieces of "confidential information." *Id.* at 11. Plaintiff was placed in administrative segregation ("ad-seg") and given notice of the reason for his placement in a CDCR 114-D form. *Id.* However, Plaintiff refused to sign the CDCR 114-D form. *Id.*

On July 9, 2009, Plaintiff met with an institutional gang investigator ("IGI") to discuss his gang validation. *Id.* at 12. Plaintiff submitted a four-page rebuttal to "refute all three (3) source items used against him." *Id.*

On July 16, 2009, Plaintiff appeared before the Institutional Classification Committee ("ICC") for review of his placement in ad-seg. *Id.* Plaintiff was retained at ad-seg "pending OCS [Office of Correctional Safety] response for possible [gang] violation." Dkt. 2-6 at 2. The ICC further noted that "[a] release to the GP [general population] may pose a threat to the safety of

[5] This Order contains many acronyms. Here, in one place, they are:

| | |
|---|---|
| ad-seg | Administrative Segregation |
| COR | CSP-Corcoran |
| DRB | Departmental Review Board |
| EME | Mexican Mafia |
| ICC | Institutional Classification Committee |
| IGI | Institutional Gang Investigator |
| GP | General Population |
| OOA | Office of Appeals |
| OCS | Office of Correctional Safety |
| PBSP | Pelican Bay State Prison |
| SHU | Secure Housing Unit |
| SDP | Step Down Process |
| STG | Security Threat Group (i.e., Gang) |

others and endanger the institution[']s security." *Id.*

On July 28, 2009, Plaintiff was validated as an EME associate. D' Agostino Decl., Ex. B at 1. Defendants Kingston, McClure, and Buechne signed the CDCR 128 B-2 "validation chrono" (an institutional record) and dated it July 28, 2009. *Id.* However, Plaintiff claims that he did not receive notice of his gang validation until August 7, 2009. Dkt. 1 at 13. On that date, Plaintiff claims to that he only learned about his gang validation during an interview with Lt. Keener. *Id.* Plaintiff informed Lt. Keener that he "was never brought back to [the ICC]," and requested for a copy of his validation chrono. *Id.* Lt. Keener then provided Plaintiff with a copy of his validation chrono. *Id.*

On August 9, 2009, Plaintiff filed a 602 inmate appeal requesting for the removal of his gang validation status and to be released from ad-seg. *Id.* at 14; *see infra* Discussion B.2.a.

On December 2, 2009, an amended validation chrono was issued to correct the date of a confidential source item used to validate Plaintiff. D' Agostino Decl., Ex. C at 1. Defendants Kissel, Rojers, and McClure signed the corrected validation chrono. *Id.*

On December 9, 2009, Plaintiff appeared at another ICC hearing, during which he was notified that he would likely be transferred to the PBSP SHU, to serve an indeterminate term as a validated EME associate. D' Agostino Decl., Ex. D at 1.

On January 13, 2010, Plaintiff was transferred to PBSP. D' Agostino Decl., Ex. I.

On January 21, 2010, Plaintiff appeared at an ICC hearing attended by Defendants Smith, Cruse, Randow, and Cappello. Dkt. 1 at 17. Plaintiff claims that these Defendants informed him that he was "re-validated on 12/2/09." *Id.* Plaintiff responded as follows, "Why, I was not given an opportunity to refute the evidence. ICC at [CSP-]Corcoran said that I was not going to be re-validated and if I were to be, I would be notified and given an opportunity to refute the charges." *Id.* Plaintiff added: "I am not a prison gang associate. The evidence used against me are [sic] false and unreliable." *Id.* at 17-18. The aforementioned Defendants "told Plaintiff that's not what we[']re here for, you could appeal your validation but right now we[']re still gonna house you in SHU per your validation status of 2/02/09." *Id.* at 18. According to the ICC hearing notes, Plaintiff seemed confused by the transfer, stating as follows: "Why did I get transferred here? I

United States District Court
Northern District of California

had a hardship to stay at COR-SHU [CSP-Corcoran SHU], I was endorsed there and th[e]y put me here at the last minute." D' Agostino Decl., Ex. E at 1. The committee advised Plaintiff that, as a validated EME associate, he had been transferred to PBSP in order to serve an indeterminate term at the PBSP SHU. *Id.* The committee further advised Plaintiff that he would be "retain[ed] in [ad-seg] pending housing availability in PBSP SHU." *Id.* Plaintiff was also "informed that the Department recognized avenues for release from SHU are through the debriefing process or through being determined to be an inactive prison gang member or associate . . . ." *Id.* Because the "last source document used in the validation process [was] dated 04/13/09, indicating recent (within 6 years) of gang activity," Plaintiff would be "eligible for an Active/Inactive Review after 2/11/2015." *Id.*

On May 15, 2014, the IGI conducted an investigation regarding Plaintiff's gang status and determined that he "met the criteria for inactive gang status and recommended his gang status as an associate of the Mexican Mafia (EME) Security Threat Group (STG) to be changed to inactive." D' Agostino Decl., Ex. F at 1.

On June 3, 2014, the OCS "validated [Plaintiff] as an inactive member of the EME STG." *Id.*

On June 30, 2014, the ICC referred Plaintiff's case to the Departmental Review Board ("DRB")—a committee comprised of members at the Division of Adult Institution's Director's, or designee's, level—for "placement consideration in an appropriate GP [general population] facility." *Id.* at 1. Plaintiff had requested transfer to Kern Valley State Prison ("KVSP"), "stating that he would like to be in a southern facility to be closer to his wife."[6] *Id.* at 3. The ICC recommended "that [Plaintiff] be transferred to KVSP for Level IV/180 GP Placement with an alternate [recommendation] of SATF [Substance Abuse Treatment Facility] for Level IV/180 GP Placement." *Id.*

On October 10, 2014, Plaintiff appeared at a DRB hearing, during which he was informed that "the DRB would be evaluating his inactive status, as well as conducting a case-by-case review

[6] The record shows that Plaintiff's wife had been diagnosed with "cancer." D' Agostino Decl., Ex. H at 2.

in regards to the new STG identification program." D' Agostino Decl., Ex. H at 2. The DRB "explained, in detail, the new STG disciplinary matrix, the Step Down Process (SDP) and specific examples of conduct which would support validation under the new validation criteria." *Id.* Plaintiff "did not indicate any safety concerns if housed on a GP." *Id.* Therefore, "[a]fter a thorough review of all [Plaintiff's] case factors, the DRB elected to affirm [Plaintiff's] validated inactive monitored status." *Id.* The Director informed Plaintiff that "he would be monitored under the new STG program and any behavior with a nexus to STG activity would be cause for placement in Step 1 of SDP." *Id.* Plaintiff "acknowledged understanding." The DRB ordered that Plaintiff be transferred to a GP yard at a level IV prison. *Id.* at 2.

On November 20, 2014, Plaintiff was transferred out of the PBSP SHU. D' Agostino Decl., Ex. I at 1. From November 20, 2014 through November 26, 2014, Plaintiff was temporarily housed at other prison as he traveled to his new location. *Id.* From November 26, 2014 through January 3, 2015, Plaintiff was housed at Calipatria State Prison, where he was placed in GP. *Id.* On January 7, 2015, Plaintiff arrived at his current location, Avenal State Prison (via North Kern State Prison's reception center), where he was placed in GP. *Id.*

**B. Background Relating to Exhaustion**

Defendants have presented Plaintiff's prison records, which they argue prove that Plaintiff did not pursue a grievance through all three levels of the CDCR's administrative grievance process relating to the claims concerning parole, the debriefing program, and alleged racial discrimination. *See* Dkt. 8 at 6-11. Since his validation in 2009, Plaintiff has exhausted four gang-affiliation or classification-related appeals to the Director's Level of Review. Voong Decl. ¶ 7, 8, 9, 10, Exs. B, C, D, E. But, as further explained below, none of these appeals raised any of the aforementioned claims. Before turning to the facts relating to exhaustion in the present case, the Court first reviews the requirements of the PLRA and administrative review process applicable to California prisoners.

**1. Legal Framework Relating to Exhaustion**

The PLRA requires a prisoner to exhaust "available administrative remedies" before bringing an action with respect to prison conditions. 42 U.S.C. § 1997e(a). "[T]he PLRA's

exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

Exhaustion of all "available" remedies is mandatory; those remedies need not meet federal standards, nor must they be "plain, speedy, and effective." *Booth v. Churner*, 532 U.S. 731, 739-40 (2001). The PLRA requires *proper* exhaustion of administrative remedies. *Woodford v. Ngo*, 548 U.S. 81, 83 (2006). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Id.* at 90-91. Thus, the PLRA requires compliance with prison grievance procedures to satisfy the exhaustion requirement. *Id.* The PLRA's exhaustion requirement cannot be satisfied "by filing an untimely or otherwise procedurally defective administrative grievance or appeal." *Id.* at 84.

The CDCR provides its inmates and parolees the right to appeal administratively "any policy, decision, action, condition, or omission by the department or its staff that the inmate or parolee can demonstrate as having a material adverse effect upon his or her health, safety, or welfare." Cal. Code Regs. tit. 15, § 3084.1(a).

To initiate an appeal, the inmate or parolee must submit a CDCR Form 602 ("appeal" or "grievance") describing the issue to be appealed to the Appeals Coordinator's office at the institution or parole region for receipt and processing. *Id.* § 3084.2(a)-(c). The level of detail in an administrative grievance necessary to exhaust a claim properly is determined by the prison's applicable grievance procedures. *Jones v. Bock*, 549 U.S. 199, 218 (2007).

In order to exhaust available administrative remedies within this system, a prisoner must submit his complaint on CDCR Form 602 and proceed through several levels of appeal: (1) informal level grievance filed directly with any correctional staff member, (2) first formal level appeal filed with one of the institution's appeal coordinators, (3) second formal level appeal filed with the institution head or designee, and (4) third formal level appeal filed with the CDCR

director or designee (i.e., "Director's level").[7] Cal. Code Regs. tit. 15, § 3084.5; *Brodheim v. Cry*, 584 F.3d 1262, 1264-65 (9th Cir. 2009). A prisoner exhausts the appeal process when he completes the third level of review. *Id.* § 3084.1(b); *Harvey v. Jordan*, 605 F.3d 681, 683 (9th Cir. 2010).

**2. Summary of Plaintiff's Grievances**

In his verified complaint, Plaintiff claims that he exhausted administrative remedies as to the claims raised in his complaint by checking the box labeled "Yes" when asked whether he filed a grievance before bringing this action in federal court. Dkt. 1 at 1. When asked to list the relevant appeal number, he only listed one appeal: log no. COR-09-03114 ("COR-09-03114"). *Id.* at 1-2. When asked to list the result of the appeal at each level of appeal, he indicates that COR-09-03114 was pursued until the Director's level of appeal and denied at all levels. *Id.* at 2. Plaintiff adds that the last level he appealed to was the "highest level of appeal available to [him]." *Id.* Finally, Plaintiff has attached a copy of the responses to COR-09-03114 at all three formal levels. Dkt. 2-9 at 2-7.

In contrast, Defendants have submitted evidence that between July 2009 and the present, the Office of Appeals ("OOA")[8] "accepted and adjudicated four administrative grievances concerning gang validation and [SHU] placement submitted by Plaintiff." Voong Decl. ¶¶ 6-10, Exs. B-E. Therefore, the Court shall elaborate on these four relevant appeals below.

**a. Log No. COR-09-03114[9]**

On August 9, 2009, while incarcerated at CSP-Corcoran, Plaintiff filed COR-09-03114 challenging his gang validation and placement in ad-seg. Dkt. 39-2 at 4-7. Specifically, Plaintiff

[7] Under the regulations, as amended effective January 28, 2011, the informal grievance level has been omitted and only three levels now exist: first level appeal, second level appeal, and third level appeal. *See* Cal. Code Regs. tit. 15, § 3084.7. As further explained below, three of the four relevant grievances were allegedly submitted before January 28, 2011; therefore, the amended regulations were not yet in effect.

[8] The OOA was formerly named the Inmate Appeals Branch. Voong Decl. ¶ 1.

[9] Because Plaintiff lists COR-09-03114 as the main appeal that exhausts the claims in the instant complaint, the Court will include a detailed description of each of the responses to COR-09-03114 at all three formal levels of appeal.

complained about his July 28, 2009 validation as a prison gang associate and the resulting SHU term imposed stating as follows:

> This appeal is based on prison gang validation and SHU term, and violation of procedural due process and vague and overbroad validation and segregation regulations. On 7-28-09 I was validated as a prison gang associate and . . . a SHU term was imposed (see attached chronos). Prison officials have a policy and practice of placing prisoners in the SHU based on mere gang (status) not gang activity (conduct) . . . ."

*Id.* at 4. Plaintiff added that he was not properly informed of his validation status pursuant to the *Castillo* court settlement. *Id.* He requested that prison officials (1) release him from the SHU, (2) expunge any erroneous information from his Central-file that supports a SHU term and gang validation, (3) reverse the gang validation and (4) promulgate clear and fair regulations regarding gang validations. *Id.* COR-09-03114 was "bypassed" at the informal level of appeal. *Id.*

On October 7, 2009, COR-09-03114 was "partially granted" at the first level of review. *Id.* at 26-27. The first-level reviewer denied Plaintiff's request (1) to release him from the SHU upon finding that he was "appropriately housed due to [his] validation as an associate of the EME prison gang." *Id.* at 26. The reviewer also denied Plaintiff's request (3) for the reversal of his gang validation upon finding his aforementioned gang validation "appropriate." *Id.* at 27. COR-09-03114 was granted as to request (2) and (4) as follows:

> Request No. 2 Granted: No information has been used erroneously to support [his] validation or [his] placement in the SHU.
>
> . . .
>
> Request No. 4 Granted: The California Department of Corrections' process for validating inmates as associates and member of prison gangs is governed by the policies and procedures explained in CCR, Title 15, Section 3378. This section outlines in detail how validations will be investigated. . . .

*Id.* Plaintiff was dissatisfied with the first-level response, and appealed it to the second level of review. *Id.* at 5.

On November 6, 2009, the first-level decision to "partially grant" COR-09-03114 was upheld at the second level of review, which stated as follows:

> Appeal Response: On October 6, 2009 you were interviewed by Sergeant A. Gomez regarding your First Level appeal, and your

> appeal was partially granted.
>
> Pursuant to the attached CDCR 128B-2 Validation Chrono, you have been validated as an associate of the Mexican Mafia (EME) prison gang. The ICC gave you a 60 day ASU extension due to a mistake on your CDCR 128B-2, Validation Chrono. The source item, Confidential Memorandum dated April 9, 2009, should read Confidential Memorandum dated August 22, 2008. Once the corrected CDCR 128B-2, Validation Chrono, is received from the [OCS], you will be scheduled for ICC for appropriate program and housing needs. Refer to the attached CDCR 128G, Classification Chrono, dated September 16, 2009.
>
> Pursuant to the CDCR 128G, Classification Chrono, dated September 16, 2009, you are appropriately housed, therefore, your request to be released from ASU is denied. (See the attached CDCR 128G noted above.)
>
> No erroneous information was used to support your validation or housing status, thus, there is nothing to remove from your Central File. The information used to support your validation and housing status meets the validation criteria pursuant to the California Code of Regulations (CCR), Title 15, Section 3378 and are in compliance with the *Castillo* Agreement. Therefore, your request [to have] erroneous information used to support your validation and housing status be expunged is denied.
>
> You were validated as an associate of the EME prison gang per the attached CDCR 128B-2 dated July 28, 2009. As such, your request that your validation be reverse[d] is denied.
>
> The California Department of Corrections and Rehabilitation's process for validating inmates as associates and member of prison gangs is governed by the policies and procedures explained in CCR, Title 15, Section 3378. This section outlines in detail how validations will be investigated. Therefore, your request [that] clear and fair validation regulations be disseminat[ed] is granted.

*Id.* at 16-17.

On March 16, 2010, COR-09-03114 was "denied" at the Director's level, which states as follows:

> Findings: A review of the SLR [second-level response] indicated that the appellant's appeal concerns have been properly addressed. The institution has appropriately followed the rules and regulations set forth by the CDCR to validate members of prison gangs. Information contained within the appellant's central file was thoroughly reviewed by institution staff familiar with the activities of gangs. It was properly determined that sufficient documentation existed to support validation from the OCS. The information used to identify the appellant has been properly documented and enclosed within his central file. The appellant also received the CDCR Dorm 128-B-2, Special Services Unit Gang Validation/Rejection Review Chrono, from the OCS that validates him as an associate of the EME prison gang on July 28, 2009.

> The Department uses available safe guards to ensure the accuracy of the information it uses and that due process rights of the inmates are not violated when processing a gang validation package. The validation process is lengthy and thorough to ensure inmates are afforded every opportunity to be issued source items being used against them, to dispute the source items being used, and to appeal the validation.
>
> The appellant's association with a prison gang has been properly documented and subsequent classification and segregated housing, based upon gang membership, will be appropriate. The appellant has failed to provide a compelling argument to warrant a modification of the decision reached by the OCS. Therefore, no relief will be afforded the appellant at the Director's Level of Review.

*Id.* at 2-3.

**b. Log No. PBSP-10-01464**

On April 21, 2010, Plaintiff submitted a 602 appeal while he was incarcerated at PBSP. *See* Log No. PBSP-10-01464. Therein, he alleged that his due process rights were violated at an ICC hearing because he was sent to the SHU without the opportunity to present a defense. Voong Decl., Ex. C. He further argued that he was entitled to an active/inactive review, to be conducted by the Law Enforcement Investigations Unit. *Id.*

The appeals coordinator bypassed the first level of review and accepted the appeal at the second level of review on June 15, 2010. *Id.* The appeal was denied at the second level on July 14, 2010. *Id.* Plaintiff submitted the appeal to the third level of review. *Id.* On February 3, 2011, the appeal was denied. *Id.*

**c. Log No. PBSP-10-02914**

On August 20, 2010, Plaintiff submitted another 602 appeal while he was incarcerated at PBSP. *See* Log. No. PBSP-10-02914. Therein, he alleged that the ICC did not consider the hardships recorded in his central file and his request for placement at a SHU closer to home. Voong Decl., Ex. D. The appeal was denied at the first level of review on October 7, 2010, and denied at the second level of review on December 10, 2010. *Id.* Plaintiff appealed to the third level. *Id.* On April 14, 2011, the appeal was denied. *Id.*

**d. Log No. PBSP-13-03534**

On October 25, 2013, Plaintiff submitted another 602 appeal while he was incarcerated at



United States District Court
Northern District of California

PBSP. *See* Log No. PBSP-13-03534. Therein, he alleged that the ICC did not meaningfully review his validation, and refused to consider his request to transfer to a SHU closer to home. Voong Decl., Ex. E. The appeal was bypassed at the first level and denied at the second level of review on November 14, 2013. *Id.* Plaintiff's appeal was denied at the third level of review on April 15, 2014. *Id.*

**C. Legal Standard for Summary Judgment**

Federal Rule of Civil Procedure 56 provides that a party may move for summary judgment on some or all of the claims or defenses presented in an action. Fed. R. Civ. P. 56(a)(1). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(c)(1)(A) (requiring citation to "particular parts of materials in the record"). If the moving party meets this initial burden, the burden then shifts to the non-moving party to present specific facts showing that a genuine issue exists for trial. *See Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

A district court may only consider admissible evidence in ruling on a motion for summary judgment. *See* Fed. R. Civ. P. 56(e); *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002). In support of the motion for summary judgment, Defendants have presented declarations and supporting exhibits from their attorney, Martine N. D'Agostino, Esq., and OOA Chief M. Voong. Dkts. 38-39. Meanwhile, Plaintiff has filed his verified complaint, verified declaration, and verified opposition along with supporting exhibits. Dkts. 1, 2, 50. The Court construes his complaint and declaration as affidavits under Federal Rule of Civil Procedure 56, insofar as they are based on personal knowledge and set forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995).

**D. Analysis Relating to Exhaustion of Administrative Remedies – Claims (4), (6), (8), (12), (13) and (16)**

The failure to exhaust administrative remedies is an affirmative defense that must be raised in a motion for summary judgment. *See Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014) (en banc). The defendants have the initial burden to prove "that there was an available administrative remedy, and that the prisoner did not exhaust that available remedy." *Id.* at 1172; *Williams v. Paramo*, 775 F.3d 1182, 1191 (9th Cir. 2015). If the defendants carry that burden, "the burden shifts to the prisoner to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Albino*, 747 F.3d at 1172. The ultimate burden of proof remains with defendants, however. *Id.* "If material facts are disputed, summary judgment should be denied, and the district judge rather than a jury should determine the facts." *Id.* at 1166.

As explained above, Defendants argue that Plaintiff did not exhaust his administrative remedies as to following claims: (i) no. 4: the debriefing policies, as set forth in California Code of Regulations, title 15, section 3378.5, violate inmates' rights against self-incrimination; (ii) no. 6: the alleged denial of a state-created liberty interest in parole based on Defendants' gang validation and SHU placement policies; (iii) no. 8: the gang policy violates his right to free association with gang members; (iv) no. 12: the claimed risks of physical harm caused by the debriefing policies; and (v) nos. 13 and 16: Hispanic gang members are more likely to be validated as gang members, to be housed in the SHU, and to be denied release because of their race. *See* Dkt. 37 at 11-13. Therefore, Defendants argue that they are entitled to summary judgment based on Plaintiff's failure to exhaust his administrative remedies as to these claims. *Id.* at 13.

In support of their argument, Defendants submit a declaration by OOA Chief Voong. According to Chief Voong, the third-level non-medical grievances are received and decided by CDCR staff at the OOA. Voong Decl. ¶ 3. Chief Voong's duties include overseeing CDCR staff who receive, screen, log, route, and assign third-level administrative grievances and monitoring the dispositions of these grievances. *Id.* Chief Voong states that between July 2009 and the present, the OOA "accepted and adjudicated four administrative grievances concerning gang validation and [SHU] placement submitted by Plaintiff," and none of the grievances raised any of

the claims listed above. *Id.* ¶¶ 6-10, Exs. B-E. The Court analyzes these four grievances below.

**1. Log No. COR-09-03114**

On August 9, 2009, while incarcerated at CSP-Corcoran, Plaintiff filed COR-09-03114, challenging his gang validation and placement in ad-seg. *See id.*, Ex. B. In it, he argued that the gang validation policies were vague and overbroad, that CDCR's gang management practices violated the *Castillo* settlement agreement, that he had not received timely notice of his validation, and that the evidence used to validate him was insufficient under existing regulations. *Id.* He did not discuss the debriefing program or the possible effect his validation and SHU placement might have on his suitability for parole. *Id.* Instead, he stated that "prison officials have a policy and practice of placing prisoners in the SHU based on mere gang affiliation (status) not gang activity (conduct)." *Id.* But he did not allege that prison officials were motivated by animus toward Plaintiff based on his race, as he had alleged in his complaint. Therefore, COR-09-03114 failed to exhaust Plaintiff's claims concerning parole, the debriefing program, and alleged racial discrimination.

**2. Log. No. PBSP-10-01464**

On April 21, 2010, Plaintiff submitted PBSP-10-1464, in which he alleged that he had been incorrectly validated without the opportunity to present a defense. *See id.*, Ex. C. He further alleged that the Law Enforcement Investigations Unit had validated him without determining if he was an active or inactive gang member. *Id.* Plaintiff alleged that only the Law Enforcement Investigations Unit can determine whether he was active or inactive, not the ICC. *Id.* Again, Plaintiff made no mention of his claims concerning parole, the debriefing program, and racial discrimination. Therefore, PBSP-10-1464 failed to exhaust Plaintiff's these aforementioned claims.

**3. Log No. PBSP-10-02914**

On August 20, 2010, Plaintiff submitted PBSP-10-02914, alleging that the ICC did not consider the hardships recorded in his central file and his request for placement at a SHU closer to home. *See id.*, Ex. D. Plaintiff explained that housing close to his family would assist in his rehabilitation. *Id.* However, Plaintiff likewise made no claims concerning parole, the debriefing

program, and racial discrimination. Therefore, PBSP-10-02914 failed to exhaust these claims.

**4. Log No. PBSP-13-03534**

On October 25, 2013, Plaintiff submitted PBSP-13-03534, alleging that the ICC did not provide him with meaningful review of his validation status, and they it refused to consider his transfer to a different SHU. *See id.*, Ex. E. He alleged that at his annual review there was no assessment of his gang activity or whether his behavior warranted SHU placement. *Id.* Just like in his other grievances above, Plaintiff did not discuss any problems, concerns or claims regarding parole, the debriefing policy, or racial discrimination. Therefore, PBSP-13-03534 failed to exhaust these claims.

In sum, Defendants have met his ultimate burden as the moving party by setting forth evidence to demonstrate Plaintiff's non-exhaustion as to his claims concerning parole, the debriefing program, and racial discrimination. Defendants have adequately shown that there were available administrative remedies that Plaintiff did not fully exhaust as to these claims. As such, the burden shifts to Plaintiff "to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Albino*, 747 F.3d at 1166.

Plaintiff argues in his opposition that he was not required to grieve each claim presented in his lawsuit, but that he merely had to challenge gang validation regulation and policies generally. Dkt. 50 at 3. Plaintiff's argument is unavailing. As mentioned above, to exhaust a claim properly, the requisite level of detail in an administrative grievance is determined by the prison's applicable grievance procedures. *Jones*, 549 U.S. at 218. However, "when a prison's grievance procedures are silent or incomplete as to factual specificity, 'a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought.'" *Griffin v. Arpaio*, 557 F. 3d 1117, 1120 (9th Cir. 2009). "A grievance need not include legal terminology or legal theories unless they are in some way needed to provide notice of the harm being grieved." *Id.* At the time the relevant grievances were filed, California regulations required the plaintiff "to describe the problem and

action requested." Cal. Code Regs. tit. 15, § 3084.2 (a) (2009).[10] Where one set of facts and circumstances gives rise to more than one potential claim, the plaintiff cannot exhaust all of the potential claims by merely exhausting one such claim. *See Morton v. Hall*, 599 F.3d 942, 946 (9th Cir. 2010) (grievance that complained of visitation restrictions, and did not mention assault or theorize that visitation restriction imposed was related to assault, was insufficient to put prison officials on notice that staff conduct contributed to assault); *O'Guinn v. Lovelock Corr. Ctr.*, 502 F.3d 1056, 1062-63 (9th Cir. 2007) (even with liberal construction, grievance requesting lower bunk due to poor balance resulting from previous brain injury was not equivalent to, and therefore did not exhaust administrative remedies for, claims of denial of mental health treatment). Here, Plaintiff was required to allege specifically his claims concerning parole, the debriefing program, and racial discrimination. His four aforementioned grievances (concerning his gang validation and SHU placement) were insufficient to put prison officials on notice of these claims he now pursues.

In his opposition, Plaintiff also contends that he had "no duty to continue to file additional grievances." Dkt. 50 at 4. Plaintiff adds that he "did put prison officials on notice of his challenge to the gang validation and was even told to not appeal this issue any more." *Id.* In support of his contention, Plaintiff has attached to his opposition another grievance dated September 26, 2012, Log No. PBSP-12-3057, in which he again attempted to challenge his gang validation by arguing that it was a "breach of contract and non-compliance [with the] *Castillo* settlement [as well as] a violation of due process." *Id.* at 15. PBSP-12-3057 was rejected at the first and second levels of appeal, but he did not pursue it any further.[11] *Id.* at 15-16. On October 2, 2012, Plaintiff was sent a letter from the PBSP Appeals Coordinator, entitled "RE: Screening at the SECOND level," stating:

---

[10] The California Code of Regulations was amended in 2012 to require inmates to "list all staff member(s) involved" and to "state all facts known and available to him/her regarding the issue." Cal. Code Regs. tit. 15, §§ 3084.2 (a)(3); 3084.2 (a)(4).

[11] Because PBSP-12-3057 was only pursued (and rejected) at the first and second levels of appeal, the Court did not include it above as one of the four relevant grievances relating to Plaintiff's gang validation and SHU placement.

> Your appeal has been rejected pursuant to the California Code of Regulations, Title 15, Section (CCR) 3084.6(b)(8). Your appeal involves multiple issues that do not derive from a single event, or are not directly related and cannot be reasonably addressed in a single response due to this fact. You may resubmit the unrelated issues separately using separate appeals. Be advised that you are still subject to the submission of one non-emergency appeal every 14 calendar days.
>
> Section B of your appeal contains two requests that cannot be appealed together. You had the opportunity to appeal your validation when it was completed in 2009, you cannot appeal the validation issues now. You need to remove the laundry list issue from Section B and the copies of 128Gs that are from committees that are longer than 30 days ago. You may only appeal the 9-19-12 ICC action. You may also keep the *Castillo* agreement as it has no verbiage that provides for any special considerations at ICC.

*Id.* at 19. At the bottom of the letter, the PBSP Appeals Coordinator further instructs:

> Be advised that you cannot appeal a rejected appeal, but [you] should take the corrective action necessary and resubmit the appeal within the timeframes specified in CCR 3084.6(a) and CCR 3084.8(b). Pursuant to CCR 3084.6(e), once an appeal has been cancelled, that appeal may not be resubmitted. However, a separate appeal can be filed on the cancellation decision. The original appeal may only be resubmitted if the appeal on the cancellation is granted.

*Id.* There is nothing in the record showing that Plaintiff challenged or sought review of the October 2, 2012 determination. Nor did Plaintiff choose to resubmit PBSP-12-3057, as he was instructed at the bottom of both the October 2, 2012 letter from the PBSP Appeals Coordinator. *Id.* There is also nothing in the record showing that Plaintiff pursued PBSP-12-3057 to the Director's level of review. *See id.* at 16; *see also* Voong Decl. ¶¶ 6-10. Again, the Court finds unavailing Plaintiff's argument that he was instructed not to file any grievances relating to his gang validation issue. First, Plaintiff's rejected appeal, PBSP-12-3057, challenged his gang validation, and it did not include his claims about parole, debriefing, or racial discrimination. Second, it does not follow that because Plaintiff was told not to include multiple issues in *one grievance*, Plaintiff could not have filed *separate grievances* addressing his concerns about his eligibility for parole, the debriefing program, or allegations of racial discrimination.

Finally, Plaintiff contends that the exhaustion requirement of the PLRA "do[es] not apply to First Amendment claims." Dkt. 50 at 6. However, such is not the case. The Supreme Court recently stated that there is only one exception to the PLRA's exhaustion requirement: when

administrative remedies are made unavailable to the inmate. *See Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). "Under § 1997e(a), the exhaustion requirement hinges on the 'availab[ility]' of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones." *Id.* at 1858. Practically speaking, this exception applies when: (1) prison officials are unable or consistently unwilling to provide any relief to aggrieved inmates; (2) the administrative scheme is "so opaque" that it is "incapable of use;" and (3) when prison administrators "thwart inmates from taking advantage of a grievance process through machination." *Id.* at 1859-60. None of these aforementioned circumstances apply here.

Accordingly, the Court finds Plaintiff's failure to exhaust administrative remedies properly (as to the claims listed above) is not excused. Defendants have adequately shown that available administrative remedies existed that Plaintiff did not fully exhaust as to his claims concerning parole, the debriefing program, and racial discrimination. Defendants are GRANTED summary judgment based thereon, more specifically, as to claims (4), (6), (8), (12), (13) and (16).

**E. Alternative Analysis Relating to Standing as to Claims (6) and (12)**

In the alternative, Defendants argue that Plaintiff lacks standing to assert claims concerning his access to parole—claim (6), and the debriefing program—claim (12). Dkt. 37 at 13-15.

Article III of the Constitution limits federal courts' jurisdiction to certain "Cases" and Controversies." U.S. Const. art. III, § 2, cl. 1. One element of the case or controversy requirement is that plaintiffs must establish that they have standing to sue. *Lujuan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992). "To establish Article III standing, an injury must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (citations omitted). "[A] plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Envtl. Serv., Inc.*, 528 U.S. 167, 185 (2000). A "generalized interest of all citizens in constitutional governance" is insufficient to confer standing. *Schlesinger v. Reservists Comm. to Stop the War, et al.*, 418 U.S. 208, 217 (1974).

Here, as to his claim concerning his access to parole, Plaintiff cannot satisfy the

requirement that his injury be "actual or imminent." *See Lujan*, 504 U.S. at 564. Specifically, Plaintiff contends that his gang validation and placement in the SHU resulted in a denial of his state-created liberty interest in parole, violating his due-process rights. However, Plaintiff has suffered no injury. Plaintiff's earliest possible parole date is September 29, 2021. D'Agostino Decl. ¶ 11; Ex. J; Dkt. 38-1 at 29. Moreover, Plaintiff is no longer incarcerated in the SHU. D'Agostino Decl.; Ex. I. As a result, the Court finds unavailing Plaintiff's argument that his gang validation and placement in the SHU deprived him of his state-created liberty interest in parole. Furthermore, any claim concerning future parole denials is speculative and conjectural. Therefore, Plaintiff cannot demonstrate that he has standing to raise this claim (6)—based on a denial of his state-created liberty interest in parole. *See Pennsylvania Prison Soc. v. Cortes*, 508 F.3d 156, 165 (3rd Cir. 2007) (citing *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) and finding that inmate-plaintiffs did not have standing to raise a due-process challenge against Board of Pardons when there was no evidence to suggest that inmates had immediate plans to apply to board, or that if they were to apply, that they were likely to receive recommendation for pardon).

Similarly, Plaintiff lacks standing to assert his allegations that the debriefing program violates his Fifth and Eighth Amendment rights—claim (12). Specifically, Plaintiff alleges that debriefing requires inmates to divulge information which might incriminate them in the future in violation of the right against self-incrimination, and that no CDCR policy can effectively protect inmates who have debriefed. However, Plaintiff fails to allege that he has participated in the debriefing process, that he has concrete plans to do so, or that he is currently required to do so for any reason. The complaint is devoid of any argument or implication that Plaintiff, for example, initiated the debriefing process but was unable to complete it without incriminating himself, or even inquired about debriefing and was told that he would have to incriminate himself to participate. Similarly, Plaintiff fails to allege that he suffered a risk to his safety because of the debriefing process—either because he participated and was subject to reprisals from other inmates, or even that he had concrete plans to participate but did not because of his fear of reprisals. In fact, Plaintiff never participated in the debriefing program, and, instead, he was deemed inactive and released from the SHU after his October 10, 2014 DRB hearing. D'Agostino Decl. ¶ 9; Ex. H.

Thus, Plaintiff lacks standing to bring any claims concerning the constitutionality of the debriefing program—claim (12).

Accordingly, Defendants are entitled to summary judgment based on Plaintiff's lack of standing to bring any claims concerning his access to parole, and the debriefing program—claims (6) and (12). The motion is GRANTED on this alternative ground as to these claims.

**F. Analysis Relating to Statute of Limitations Relating to Claims Arising Out of Plaintiff's 2009 Gang Validation - Claims (1), (3), (11), (14) and (15)**

Plaintiff alleges due process claims arising out of his July 28, 2009 validation and his December 2, 2009 amended validation—claims (1), (3), (11), (14) and (15). Dkt. 1 at 22-23. Defendants argue that these claims are time-barred. Dkt. 37 at 15-17.

**1. Statute of Limitations Generally**

Section 1983 does not contain its own limitations period. The appropriate period is that of the forum state's statute of limitations for personal injury torts. *See Wilson v. Garcia*, 471 U.S. 261, 276 (1985), *partially superseded by statute as stated in Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 377-78 (2004). In California, the general residual statute of limitations for personal injury actions is the two-year period set forth at California Civil Procedure Code § 335.1 and is the applicable statute in section 1983 actions. *See Maldonado v. Harris*, 370 F.3d 945, 954 (9th Cir. 2004). It is federal law, however, that determines when a cause of action accrues and the statute of limitations begins to run in a section 1983 action. *Wallace v. Kato*, 549 U.S. 384, 388 (2007). Under federal law, a claim accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action. *See TwoRivers v. Lewis*, 174 F.3d 987, 991-92 (9th Cir. 1999).

A federal court must give effect to a state's tolling provisions. *See Hardin v. Straub*, 490 U.S. 536, 543-44 (1989); *Marks v. Parra*, 785 F.2d 1419, 1419-20 (9th Cir. 1986). California Civil Procedure Code § 352.1 recognizes imprisonment as a disability that tolls the statute of limitations when a person is "imprisoned on a criminal charge, or in execution under the sentence of a criminal court for a term less than for life." Cal. Civ. Proc. Code § 352.1(a). A prisoner serving a term of life with the possibility of parole is considered a prisoner serving a term of less than life. *Martinez v. Gomez*, 137 F.3d 1124, 1126 (9th Cir. 1998). The tolling is not indefinite,

however, the disability of imprisonment delays the accrual of the cause of action for a maximum of two years. *See* Cal. Civ. Proc. Code § 352.1(a). Tolling under section 352.1 is triggered by the plaintiff's arrest and incarceration. *See Elliott v. City of Union City*, 25 F.3d 800, 802-03 (9th Cir. 1994).

**2. Statutory Tolling Pursuant to California Code of Civil Procedure § 352.1**

Under California Code of Civil Procedure § 352.1, the two-year statute of limitations applicable to Plaintiff's claims should be tolled for another two years because Plaintiff is serving twenty-seven years to life. *See* Dkt. 1 at 32; *see also* Cal. Civ. Proc. Code § 352.1(a), (c). His life sentence with the possibility of parole is considered a prisoner serving a term of less than life. *See Martinez*, 137 F.3d at 1125-26. Therefore, Plaintiff is entitled to the benefit of statutory tolling as prescribed in section 352.1. *See Elliott*, 25 F.3d at 802-03.

Here, Plaintiff was validated as an EME associate on July 28, 2009. D' Agostino Decl., Ex. B at 1. However, Plaintiff alleges that he did not receive notice of his gang validation until August 7, 2009, the date that he was given a copy of his validation chrono by Lt. Keener. Dkt. 1 at 13. Assuming that this is correct, Plaintiff's claim accrued on August 7, 2009. After two years of statutory tolling for incarceration, the two-year statute of limitations on Plaintiff's claim began to run on August 7, 2009 and ended on August 7, 2013.

Meanwhile, Plaintiff's due process claim based on the issuance of an amended validation on December 2, 2009 accrued when he was informed of the "re-validation" his January 21, 2010 classification hearing. Dkt. 1 at 17. After two years of statutory tolling for incarceration, the two-year statute of limitations on this claim began to run on January 21, 2010 and ended on January 21, 2014.

Despite the fact that Plaintiff was allotted *four* years to file his claim, he failed to do so until February 3, 2015—which is past the expiration of the statute of limitations for his due process claims arising out of his July 28, 2009 validation (expired on August 7, 2013), and based on his December 2, 2009 amended validation (expired on January 21, 2014). Therefore, Plaintiff's due process claims are barred by the statute of limitations unless equitable principles require further tolling. The Court addresses that issue next.

**3. Extending Limitations Period on Equitable Grounds**

Two doctrines may extend the limitations period on equitable grounds—equitable tolling and equitable estoppel. *Lukovsky v. San Francisco*, 535 F.3d 1044, 1051 (9th Cir. 2008). Equitable tolling focuses on "whether there was excusable delay by the plaintiff: 'If a reasonable plaintiff would not have known of the existence of a possible claim within the limitations period, then equitable tolling will serve to extend the statute of limitations for filing suit until the plaintiff can gather what information he needs.'" *Johnson v. Henderson*, 314 F.3d 409, 414 (9th Cir. 2002). "Equitable estoppel, on the other hand, focuses primarily on actions taken by the defendant to prevent a plaintiff from filing suit, sometimes referred to as 'fraudulent concealment.'" *Lukovsky*, 535 F.3d at 1051 (citing *Johnson*, 314 F.3d at 414).

Plaintiff claims that that equitable tolling should apply: (a) based on the continuing violation theory; (b) during the pendency of his grievance (COR-09-03114); and (c) during the pendency of his prior lawsuit, in which he had raised the same claims as the instant action.

**a. Equitable Tolling Based on Continuing Violation Theory**

Plaintiff invokes the continuing-violations doctrine, arguing that it "extends the accrual of his claim" because he can demonstrate a "serial violation" and a "systemic policy and practice of discrimination." Dkt. 1 at 47 (citations omitted).

The "related acts" continuing violation theory allows plaintiff to seek relief for events outside of the limitations period if a series of violations are related closely enough to constitute a continuing violation and that one or more of the acts falls within the limitations period. *See Knox v. Davis*, 260 F.3d 1009, 1013 (9th Cir. 2001) (citations omitted). Before 2002, a plaintiff could invoke the continuing-violation doctrine by showing a series of related acts, one or more of which fell within the limitations period, or a systemic policy or practice of discrimination before and during the limitations period. *See Gutowsky v. Cnty. of Placer*, 108 F.3d 256, 259 (9th Cir. 1997). However, in *Nat'l R.R. Passenger Corp. v. Morgan*, the Supreme Court held that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." 536 U.S. 101, 113 (2002); *Carpinteria Valley Farms, Ltd. v. Cnty. of Santa Barbara*, 344 F.3d 822, 828 (9th Cir. 2003) (applying the doctrine to section 1983 cases). Thus,

even if Plaintiff's complaint alleges acts as part of an ongoing policy or practice, if the "heart of plaintiffs' complaint does not stem from the policy . . . but rather from the individualized decisions that resulted from implementation of a policy[,] [then] . . . [t]hese individualized decisions are best characterized as discrete acts, rather than as a pattern or practice of discrimination." *Cherosky v. Henderson*, 330 F.3d 1243, 1247-48 (9th Cir. 2003) (holding that plaintiffs' allegation that discrete acts, which fell outside the limitations period, were undertaken pursuant to a discriminatory policy that continued to be implemented within the limitations period does not extend the limitations period as to the time-barred acts). In other words, "each time a policy is invoked to deny an individual plaintiff's request, an independently wrongful, discrete act occurs, a claim accrues, and the limitations period begins to run." *Pouncil v. Tilton*, 704 F.3d 568, 579 (9th Cir. 2012).

Plaintiff appears to argue as follows: A continuing violation occurred for the entire time frame of 4 years and 9 months, i.e., from July 28, 2009 (date of his original gang validation) through May 14, 2014 (the day before the date he was found to be inactive). *See* Dkt. 1 at 47. The latter date would have been the final day of the continuing violation. *See id.* He then claims his cause of action accrued on that latter date, such that it would not have expired until four years later, namely on May 14, 2018. *See id.* On this theory, Plaintiff seems to argue that the instant complaint filed on February 3, 2015 would have then been timely.

The Court finds Plaintiff's argument to be without merit. Plaintiff's due process claims arise out of a series of discrete acts occurring at three different junctures: (1) his original July 28, 2009 validation at CSP-Corcoran; (2) the review of his original and amended validation at OCS in Sacramento; and (3) his January 13, 2010 transfer to PBSP and eventual retention in the PBSP SHU. These aforementioned acts are "individualized decisions that resulted from implementation of a policy" to which the continuing violation doctrine does not apply. *Cherosky*, 330 F.3d at 1247. Specifically, all of the acts of which Plaintiff complains arise out of CDCR's gang validation policy as it existed in when he was originally validated on July 28, 2009, which should have been the date during which Plaintiff was notified of any alleged wrongful acts based on that validation. *See* Cal. Code Regs., tit. 15, §3378 (2009). Therefore, the date of accrual would be

when Plaintiff was originally validated on July 28, 2009 and *not* on May 14, 2014, the day before he was found to be inactive. *Compare Delaware State College v. Ricks*, 449 U.S. 250 (1980) (concluding that limitations period commenced when professor received letter notifying him of the denial of tenure and renewal of contract through the end of the year—not when the contract expired because the termination was "a delayed, but inevitable, consequence of the denial of tenure"), *and Knox*, 260 F.3d at 1013 (rejecting plaintiff's claim of a continuing violation theory when she had notice of all wrongful acts she wished to challenge at the time she received original letter (outside the limitations period) notifying her that she was permanently denied all mail privileges) *with Morgan*, 536 U.S. at 113-16 (stating that even if there was a prior, related past act, courts must decide whether plaintiff's claim is based on an independent, wrongful, discrete act, and if so, the limitations period begins to run from the date of that discrete act). Therefore, the Court finds the continuing violation theory does not apply here and thus Plaintiff's due process claims arising out of his 2009 validation and amended validation are still time barred.

**b. Equitable Tolling Stemming from Plaintiff Filing Grievance (COR-09-03114)**

Next the Court reviews whether Plaintiff is entitled to equitable tolling during the time his grievance (COR-09-03114) was pending. The record shows that Plaintiff filed COR-09-03114 on August 9, 2009. Under California law, equitable tolling "'reliev[es] plaintiff from the bar of a limitations statute when, possessing several legal remedies he, reasonably and in good faith, pursues one designed to lessen the extent of his injuries or damage.'" *Cervantes v. City of San Diego*, 5 F.3d 1273, 1275 (9th Cir. 1993) (quoting *Addison v. State of California*, 21 Cal. 3d 313, 317 (1978)). Thus, in an appropriate case, the statute of limitations might be tolled for time spent pursuing a remedy in another forum before filing the claim in federal court. The California Supreme Court in *Lantzy v. Centex Homes*, explained the effect of equitable tolling on the statute of limitations:

> . . . the effect of equitable tolling is that the limitations period stops running during the tolling event, and begins to run again only when the tolling event has concluded. As a consequence, the tolled interval, no matter when it took place, is tacked onto the end of the limitations period, thus extending the deadline for suit by the entire length of time during which the tolling event previously occurred.

31 Cal. 4th 363, 370-71 (2003), *as modified* (Aug. 27, 2003).

Defendants concede that, for the purposes of the motion for summary judgment, Plaintiff's due process claim arising out of his 2009 gang validation "was tolled while he pursued his administrative remedies . . . ." Dkt. 52 at 6. However, Defendants argue that even if Plaintiff is provided the benefit of the entire time for which equitable tolling applies, this due process claim remains time-barred. *Id.*

Plaintiff can claim that he was attempting to lessen the extent of his injuries by pursuing his administrative remedies from August 9, 2009 (the date he filed COR-09-03114)[12] until March 16, 2010 (the date the Director's Level decision in COR-09-03114 was rendered), which is a total of 219 days. In order to incorporate the effect of equitable tolling as explained by the California Supreme Court in *Lantzy*, 31 Cal. 4th at 370-71, this Court re-states its calculation relating to the statute of limitations deadline. *See supra* Discussion F.2. The Court has determined above that Plaintiff's cause of action as to this due process claim accrued on August 7, 2009. *Id.* After two years of statutory tolling for incarceration, the two-year statute of limitations on Plaintiff's claim began to run on August 7, 2009 and ended on August 7, 2013. *Id.* Pursuant to *Lantzy*, no matter when it took place, the 219 days tolled interval is "tacked onto the end of the limitations period," thus extending Plaintiff's deadline for suit by the entire length of time during he was pursuing his administrative filings. *See id.* In accordance with *Lantzy*, the Court tacks on 219 days of equitable tolling after the August 7, 2013 deadline, and Plaintiff would have had until March 14, 2014 to file a timely federal complaint. Plaintiff did not constructively file his federal complaint until February 3, 2015—326 days after the statute of limitations ended. Thus, despite granting Plaintiff equitable tolling during the time he pursued COR-09-03114, Plaintiff's due process claim arising out of his 2009 gang validation is still untimely by 326 days.

**c. Equitable Tolling Stemming from Plaintiff Filing Prior Lawsuit**

First, Plaintiff argues that the Court should toll the limitations period because his access to the courts was "delayed, frustrated, and impeded." Dkt. 50 at 8. However, such an argument is

---

[12] Defendants incorrectly note the date that Plaintiff filed COR-09-03114 as August ***7***, 2009, *see* Dkt. 37 at 15, instead of the actual date of August ***9***, 2009, *see* Dkt. 39-2 at 4.

unavailing. Contrary to Plaintiff's claim, the record shows that he was able to file a prior lawsuit, concerning the same matters alleged in the instant case, during the limitations period, Case No. C 13-3337 YGR (PR), proving his access to the courts was *not* impeded.[13]

In the alternative, Plaintiff argues that he is entitled to tolling while he was litigating the first lawsuit. As mentioned above, Plaintiff claims he "originally filed this complaint on March 21, 2014." Dkt. 1 at 9. However, March 21, 2014 was the date he filed his second amended complaint in Case No. C 13-3337 YGR (PR). *See* Dkt. 24 in Case No. C 13-3337 YGR (PR). Plaintiff actually commenced his prior lawsuit on July 17, 2013, the date he filed his initial complaint. *See* Dkt. 1 in Case No. C 13-3337 YGR (PR). Because the statute of limitations had not yet expired when his previous action was filed, Plaintiff argues that he is entitled to equitable tolling of the statute of limitations based on the filing of an earlier, timely action.

Meanwhile, Defendants disagree and point out that Plaintiff's prior action in Case No. C 13-3337 YGR (PR) was dismissed without prejudice because Plaintiff voluntarily dismissed it, and they argue that "[a] voluntary dismissal of the first suit does not toll the statute of limitations." Dkt. 52 at 7 (citing *Wood v. Elling Corp.*, 20 Cal. 3d 353, 361 (1977) ("If a timely action dismissed without prejudice were, without more, to have the effect of tolling the statute of limitations during the pendency of that action, an indefinite extension of the statutory period—through successive filings and dismissals—might well result.").

In an appropriate case, the statute of limitations might be tolled for time spent pursuing a remedy in a separate forum before filing the claim in federal court. Here, as an initial matter, it seems that equitable tolling is not applicable in Plaintiff's case because his first action was not one

[13] Nor can Plaintiff show that Defendants engaged in dilatory tactics that prevented him from filing within the limitations period. Attached to Plaintiff's opposition are two grievances relating to access to the law library. In the first grievance, Log No. PBSP-13-2173, dated August 5, 2013, Plaintiff complains that the law librarian failed to deliver his certificate of funds to support his request for *in forma pauperis* status. Dkt. 50 at 23-24. In the second, Log No. PBSP-13-3130, dated September 30, 2013, Plaintiff complains that PBSP staff did not allow SHU inmates to go to law library frequently enough. *Id.* at 29-30. PBSP-13-3130 was denied at the Director's level, which noted that Plaintiff "did not provide any evidence that he ha[d] missed a court deadline due to his inability to physically access the law library at PBSP." *Id.* at 32. These two grievances are insufficient to excuse Plaintiff's untimeliness because they fall far short of demonstrating that Plaintiff was effectively unable to file the instant complaint in a timely manner.

in a *separate* forum, such as in a state court or administrative forum, but in the *same* forum. *See Thomas v. Gilliland*, 95 Cal. App. 4th 427, 525 (2002) ("The doctrine of equitable tolling, however, only applies where the plaintiff has alternate remedies and has acted in good faith."); *Martell v. Antelope Valley Hosp. Med. Ctr.*, 67 Cal. App. 4th 978, 985 (1998) ("[A]ppellants pursued successive claims in the same forum, and therefore equitable tolling did not apply"). That is, Plaintiff's first action was not one of several legal remedies that he chose to pursue in order to "lessen the extent of his injuries or damage." *Cervantes*, 5 F.3d at 1275.

However, a plaintiff may also argue the statute of limitations should be tolled based on the filing of an earlier, timely action based upon general equitable principles ("*Bollinger* rule"). *See Addison*, 21 Cal. 3d at 318-19 (citing *Bollinger v. National Fire Ins. Co.*, 25 Cal. 2d 399 (1944)). The *Bollinger* rule of tolling will apply when "(1) the plaintiff [has] diligently pursued his or her claim; (2) the fact that the plaintiff is left without a judicial forum for resolution of the claim [is] attributable to forces outside the control of the plaintiff, [i.e., the dismissal of the first action was in error and, thus, due to forces outside of his own control]; and (3) the defendant [is not] prejudiced by application of the doctrine (which is normally not a factor since the defendant will have had notice of the first action)." *Hull v. Cent. Pathology Serv. Med. Clinic*, 28 Cal. App. 4th 1328, 1336 (1994) (brackets added). California law makes clear that in order to be entitled to equitable tolling under the *Bollinger* rule, a plaintiff must demonstrate all three *Bollinger* factors. *See Allen v. Greyhound Lines, Inc.*, 656 F.2d 418, 421 (9th Cir. 1981) ("The [California Supreme Court] thus made it clear that to avoid the literal language of [section 335], the plaintiff must demonstrate the existence of those three factors present in *Bollinger*."); *Hull*, 28 Cal. App. 4th at 1337 (reiterating that the three *Bollinger* factors are prerequisites expressly required to apply tolling); *Wood*, 20 Cal. 3d at 361 ("the concurrence of the three factors present in *Bollinger* is essential to an application of the rule").

The Court shall now consider whether all three *Bollinger* factors are present before equitable tolling can apply. In *Bollinger*, a plaintiff filed a timely action against his fire insurance carrier, but the trial court erroneously dismissed that action. 25 Cal. 2d at 404-05. The California Supreme Court held, that, under its equitable power, and under those circumstances, the plaintiff

could file a second action against the carrier outside the statute of limitations. *Id.* at 410-11. The court held that tolling was appropriate because (1) the original dismissal was erroneous; (2) the plaintiff had diligently pursued his claim; and (3) the defendant was not prejudiced. *Id.*

In contrast here, Plaintiff cannot satisfy all three *Bollinger* factors. Specifically, Plaintiff fails to satisfy the second *Bollinger* factor because he does not allege that the Court erred in dismissing his first action, or that it was dismissed due to forces outside of his own control.

Despite Plaintiff's previous civil rights action, Case No. C 13-3337 YGR (PR)—which raised the same claims as the instant action—being timely, the Court's August 15, 2014 dismissal of that case, based on Plaintiff's voluntary dismissal, was *not* in error and, thus, *not* due to forces outside of his own control. In fact, it was very much *within* Plaintiff's control because he chose to voluntarily dismiss that prior action. And, as mentioned above, Plaintiff filed the instant complaint on February 3, 2015—almost six months later.

Plaintiff has not and cannot demonstrate that the Court's dismissal of his first action was erroneous and due to forces outside of his own control—the second *Bollinger* factor. Having so concluded, the Court finds Plaintiff is not entitled to equitable tolling of the statute of limitations while he was litigating his prior lawsuit, and declines to address the remaining two *Bollinger* factors. *See Wood*, 20 Cal. 3d at 361 (all three elements must be present before equitable tolling will apply); *Hull*, 28 Cal. App. 4th at 1336, n. 7 (because plaintiff failed to meet first two prongs for equitable tolling court need not determine third prong of whether defendants would be prejudiced).

Accordingly, Plaintiff's due process claims arising out of his 2009 validation and amended validation—claims (1), (3), (11), (14) and (15)—are DISMISSED with prejudice as time-barred, and Defendants' motion for summary judgment as to these claims is GRANTED.

**G. State Law Claims – Claims (9) and (10)**

Plaintiff's remaining claims of violations of various provisions of California constitutional and statutory law—claims (9) and (10)—are DISMISSED under the authority of 28 U.S.C. § 1367(c)(3). *See Ove v. Gwinn*, 264 F.3d 817, 826 (9th Cir. 2001) (court may decline to exercise supplemental jurisdiction over related state law claims under § 1367(c)(3) once it has dismissed all



United States District Court
Northern District of California

United States District Court
Northern District of California

claims over which it has original jurisdiction*); see also Acri v. Varian Associates, Inc.*, 114 F.3d 999, 1000 (9th Cir. 1997) (although discretionary, claims under state law should be dismissed when associated federal claims are dismissed before trial). The dismissal is without prejudice; Plaintiff may proceed with his state law claims in state court. *See Reynolds v. County of San Diego*, 84 F.3d 1162, 1171 (9th Cir. 1996) (dismissal of pendent state claims following dismissal of federal claims must be without prejudice), *rev'd on other grounds by Acri*, 114 F.3d at 1001.

## III. CONCLUSION

For the reasons outlined above, the Court orders as follows:

1. Defendants' motion for summary judgment is GRANTED as to all federal claims. Dkt. 37.

2. All state law claims are DISMISSED without prejudice.

3. The Clerk shall enter judgment in favor of Defendants, terminate all pending motions, and close the file.

4. This Order terminates Docket No. 37.

IT IS SO ORDERED.

Dated: March 16, 2017

YVONNE GONZALEZ ROGERS
United States District Judge